IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

             v.                                        21-CR-6097-DGL

STEPHEN REED PATTISON,

                  Defendant.
_____

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorneys, Trini E. Ross, United States Attorney for the Western District of New York, and Brett A. Harvey, Assistant United States Attorney, hereby makes and files its sentencing memorandum relating to the defendant, STEPHEN REED PATTISON.

## I.    INTRODUCTION

"Go ahead nigger, defund the police so . . . I can just start fucking murderin' you all in a genocidal rate by fuckin' myself. They'll be callin' me the angel of death. They'll be callin' me the new Josef Mengele." The defendant – a convicted violent felon, parole absconder, and avowed white supremacist – spoke these words on the day that he illegally obtained a shotgun and box of ammunition. This statement is just one of countless others in which the defendant expressed racial animus and/or threatened violence against individuals and groups who were protesting, and in some cases rioting, over the deaths of George Floyd and Daniel Prude in 2020. After law enforcement seized two firearms and ammunition from the defendant's bedroom, the defendant attempted to obstruct justice by telling his girlfriend to lie to law

enforcement authorities and obtain false affidavits from the individuals who gave him the firearms. Such conduct warrants a sentence of 120 months' imprisonment.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   PROCEDURAL HISTORY

On November 25, 2020, the defendant was charged in Criminal Complaint No. 20-MJ-4223 with possession of firearms by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (Dkt. 1).

On June 10, 2021, a federal grand jury returned Indictment No. 21-CR-6097, which charged the defendant with one count of possession of firearms and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (Dkt. 14).

On November 8, 2021, the defendant pleaded guilty, pursuant to a written plea agreement, to the sole count of the Indictment. (Dkt. 24). In the plea agreement, both parties agreed to the Guidelines calculations and reserved the right to request a non-Guidelines sentence. (Dkt. 24).

In the Pre-Sentence Report (PSR), the Probation Office calculated the same Guidelines calculations as those contained in the plea agreement. (PSR at ¶¶ 99-108, 119, 131).

### B.   SUMMARY OF OFFENSE AND RELEVANT CONDUCT

The facts and circumstances of the offense of conviction are set forth in detail in the factual basis of the plea agreement and the PSR. A summary of the relevant facts is set forth below.

1. __The History and Characteristics of the Defendant's__

As detailed in the PSR and in this submission, the defendant is a self-described racist who supports white supremacist ideology, and expressed racial animus and open hostility to Black Lives Matter (BLM) and ANTIFA. (PSR at ¶ 34). He has a significant criminal history, which consists of the following:

a.     a felony conviction for Domestic Assault 2° from Missouri in 2016, which involved an incident where the defendant struck his girlfriend in the legs, grabbed her by the neck with both arms and choked her so hard she was unable to breathe, punched her in the back of the head, threatened to drown and smother her to death, and threatened to have his cousin "shoot [her] in the face." (*Id.* at ¶ 115);

b.     misdemeanor convictions for Hate Crime/Menacing 2° and Criminal Mischief 4° from Macedon Town Court in 2009, which involved an incident where the defendant and others called the victim a "nigger," and broke the victim's patio furniture and threw it at the victim's residence. (*Id.* at ¶ 112);

c.     a misdemeanor conviction for Criminal Mischief 4° from East Rochester Town Court in 2013, which involved an incident where the defendant and another individual walked down the street yelling "white supremacy" and "I hate this town," and the defendant approached the female victim, called her a "spic," ripped down the victim's Mexican flag from her porch, pushed her face, and told her to "go back to Clinton." (*Id.* at ¶ 114); and

d.     a misdemeanor conviction for Menacing 2° (Weapon) from Tonawanda Town Court in 2018, which involved an incident where the defendant began screaming racial slurs in a pub in Buffalo, New York, and was asked to leave. The defendant left the pub, punched

3

the rearview mirror of a truck (which caused it to shatter), pulled a large hunting knife from his side and started waving it in the direction of the victim, and stated, "I will kill everyone in this house and I will kill myself before going back to prison." (*Id.* at ¶¶ 116).

### 2. <u>Nature and Circumstances of the Offense</u>

Between May 2020 and October 2020, the defendant used social media to express his rage over local protests relating to the deaths of George Floyd and Daniel Prude. (PSR at ¶ 20). For example, in a public Facebook post on May 30, 2020, the defendant stated, "Rochester NY is at WAR keep ur BLM [Black Lives Matter] shit in the city if u come around my family ill fucking kill u." (*Id.*). Similarly, in a public Facebook post on September 24, 2020, the defendant stated "as for all u black fucks talkin shit I'm in the city of Rochester we can meet up anywhere u want cause ur bitches too and I don't want it with me and mine . . . WE THE PEOPLE should be able to slaughter anybody trying to bring communism to this country." (*Id.* at ¶ 22).

On October 30, 2020, members of the investigative team arrested the defendant on a parole absconder warrant from Missouri. (PSR at ¶ 24). At the time of his arrest, the defendant possessed a cell phone, which was enclosed in a case bearing symbols relating to white supremacist ideology, including the numbers "14" and "88",[1] the Nazi "SS" symbol, and a white power crosshair symbol. (*Id.*). The defendant's cell phone contained various images

---

1 The numbers "14" and "88" are commonly associated with white supremacist ideology. Specifically, the number "14" is shorthand for the "14 words" slogan, "We must secure the existence of our people and a future for white children." The number "88" is a reference to "HH" (H being the eighth letter of the alphabet), which stands for "Heil Hitler." I am informed by the investigative team that use of these numbers signifies an endorsement of white supremacist ideology.

that read, among other things, "White Lives Matter More," "Goodnight Antifa Scum" (with a silhouette of an individual assaulting another individual lying on the ground), "Hospitalize Your Local Antifa Scumbag," and "Anti-Antifa." The defendant's cell phone also contained numerous photographs and images of Nazi and white supremacist propaganda, including references to "14" and "88," and white supremacist groups. (*Id.* at ¶ 34).

After his arrest, the defendant was held in custody at the Monroe County Jail. In recorded jail calls, the defendant made statements to Rochelle Pfenninger, his girlfriend and mother of two of his children, indicating that he possessed firearms and ammunition at their residence at 552 Church Road, Hilton, New York. (PSR at ¶¶ 25-29).

On November 12, 2020, deputies from the Monroe County Sheriff's Office, assisted by members of the Rochester Joint Terrorism Task Force (JTTF), executed a state search warrant at 552 Church Road. During a search of the defendant's bedroom, the search team found, among other things, one (1) Smith and Wesson ITC, Model Compass, 30-06 rifle, bearing serial number U231831; one (1) Winchester Ranger, Model 120, 12 gauge shotgun, bearing serial number L1929872; a box containing 25 rounds of 12 gauge shotgun ammunition (Winchester); a Missouri Department of Corrections Offender card bearing the defendant's name and photograph, a Department of Corrections Adult Institution Fact Sheet bearing the defendant's name, and three Missouri Department of Corrections Board of Probation and Parole Field Violation Reports bearing the defendant's name; a black tactical vest with an expandable baton and fixed blade knife attached to the vest, a sword in a sheath, and throwing axes; and white supremacist and Nazi paraphernalia, as well as depictions of white supremacist and Nazi imagery and symbols. (Dkt. 24 at ¶ 5(a)-(d); PSR at ¶¶ 31-32).

The defendant's cell phone contained photographs of the 30-06 rifle and 12 gauge shotgun, and the defendant holding firearms. (PSR at ¶¶ 34-37). Below is a photograph obtained from the defendant's cell phone of the defendant holding the 12 gauge shotgun in front of a flag bearing the name "Blood and Honour," and the numbers "14" and "88".



In the plea agreement, the defendant admitted to acquiring the 30-06 rifle from a female with the initials C.B. on or about October 24, 2020, and the 12 gauge shotgun and ammunition from Donald P. Oshier a/k/a Bam on or about October 27, 2020; and to constructively possessing the 30-06 rifle, 12 gauge shotgun, and ammunition after he was arrested on October 30, 2020. (Dkt. 24, at ¶ 5(b)-(c); PSR at ¶ 23).

As detailed in the PSR, records from the defendant's Facebook account[2] were littered with racial slurs, threats against BLM and ANTIFA, admissions about assaulting multiple ANTIFA members,[3] and references to white supremacy and a Racial Holy War. (PSR at ¶¶

---

2  The records for the Facebook account ending in 1453 consisted of 52,990 pages. A copy of these records were disclosed to the defense as part of voluntary discovery in this case.

3  It should be noted that, while the defendant made several admissions to assaulting ANTIFA members in his Facebook messages, the government could not find any police reports confirming that such assaults occurred. It should also be noted, however, that ANITFA is an anti-government group, and its members are known to avoid

39-48, 51-55, 57). Below are additional illustrations of the types of statements made by the defendant on his Facebook account.

     a.     On June 18, 2020, the defendant sent Facebook messages to an individual with the initials D.K. in which he stated, ""I'm getting really angry with this." D.K. responded, "I know you are . . . [a]nd it's only the beginning." The defendant then stated, "Yup and when it kicks off im killing there kids." D.K. then asked, "[w]hy the kids too though? Because they brainwash them?" The defendant responded, "Clean there [sic] blood line . . . [j]ust how they attack like cowards ill hit where it hurts." Later that day, the defendant sent a message stating, "Im angry right now all i want to do is kill and im trying so hard to sit back and be patient";

     b.     On June 27, 2020, the defendant sent a Facebook message to an individual with the initials L.W. in which he stated, "I got a couple [meaning ANTIFA members] in Maryland on my way back from VA last week I hope they defund the police then my fun begins RAHOWA [Racial Holy War] cleansing";

     c.     On July 12, 2020, the defendant sent a Facebook message to Donald P. Oshier in which he stated, "I love it to bro that's y I fight this fight I live by the 14 words." The defendant then stated, "We must secure the existence of our people and the future for white children," which, as stated above, is a white supremacist motto;

     d.     On August 3, 2020, the defendant sent Facebook messages to the female with the initials C.B. in which he stated, "Fuck these niggers . . . Abolish the police and its hunting season";

     e.     On August 19, 2020, the defendant sent a Facebook message to Oshier in which

cooperating with law enforcement.

he quoted song lyrics from a group called Angry Aryans. The lyrics were "It's time to kick some ass pulverize the nigger trash the fuckin fags garb your self a club beat down a lousy jew leave his kosher carcus bloody black and blue";

     f.     On August 14, 2020, the defendant sent a Facebook message in which he stated, "I'm ready for RAHOWA [Racial Holy War]";

     g.     On October 9, 2020, the defendant sent a Facebook message in which he stated, "I was ANazi skinhead and still am at heart the clothing might have changed but the truth cant be untold I'm just glad all the shit we been saying for 30 years there doing it in everybody's face weve been talking about RAHOWA for 30 plus years";

     h.     On September 13, 2020, the defendant exchanged Facebook messages with C.B. C.B. stated, "Fucking niggers". The defendant responded, "I want to kill em . . .U come here with ur kids if this kicks off . . . Will kill Niggers together ;)";

     i.     On September 14, 2020, the defendant sent a Facebook message to Oshier in which he stated, "O shit bro thank u but I dont need the wrist rocket I'm guna kill them when it's time I need a gun";

     j.     On September 19, 2020, the defendant sent a Facebook message in which he stated, "Defund the police so niggers can be niggers let them kill each other cause u dont wanto see what I'll do if I ger that chance";

     k.     On September 27, 2020, the defendant sent a Facebook message in which he stated, "No justice no police kill these BLM thiefs";

     l.     On October 10, 2020, Oshier sent a Facebook message to the defendant in which he stated, "⚡ ⚡ ♡ we must secure the existence of our people, and the future for

white children- so the beauty of the white Aryan woman may not perish from this Earth ♡."

The defendant responded, "⚡⚡", "14" and "88."

In addition, the Facebook records contained voice messages between the defendant and Oshier in which the defendant expressed his willingness and intention to shoot and kill African-Americans and protesters. (PSR at ¶ 66). Transcripts of three of the voice messages are set forth below.

a.    On September 14, 2020, the defendant sent a Facebook voice message stating:

Like, these dudes really came to our city out of all the cities to come to, not even New York City, they came to our city. And they're fucking doing the same shit as Portland . . . Dude, this is not a fucking joke. Like if they come to my house, I'm not gonna maim them, I'm not gonna fistfight them, **I'm gonna fucking kill them**. Do I want to? No, not particularly but I'm going to. And I – and that's what I'm going to do. But I'm not here to play games with these people.

b.    On October 27, 2020, the same day that the defendant obtained the shotgun and ammunition from Oshier, the defendant sent two Facebook voice messages stating:

And then . . . the next fucking video will be something about Elijah Mohammed and all these fucking every . . . nigger thinks they're a Goddamn Muslim now. I'm fucking tired of this shit. And they can all stick together, and they can all say, 'Fuck white people this' . . . man fuck that shit bro. **Let 'em start coming around here pumpin' that shit and I'm some pump fuckin' shells through their head**.

Yeah, they need to stop, or they need to kick the shit off man because I'm getting tired of hearing their dumb ass nigger bullshit. What talkin' about, 'O-o-o they're still white people in hoods that wear badges,' da-da-da-da-da-da. **Go ahead nigger, defund the police so [unintelligible] so I can just start fucking murderin' you all in a genocidal rate by fuckin' myself. They'll be callin' me the angel of death. They'll be callin' me the new Josef Mengele**.[4]

---

4 Josef Mengele, known as the "Angel of Death," was a German SS officer during World War II who, among other things, performed deadly experiments on Jewish prisoners and sent Jewish prisoners to the gas chamber at the Auschwitz concentration camp.

9

## 3. **The Defendant's Obstructive Conduct**

Before and after he was charged in federal court, the defendant attempted to obstruct and impede justice with respect to the investigation and prosecution of this case. In the days after the search warrant at 552 Church Road, the defendant, who was detained at the Monroe County Jail, made several telephone calls to Rochelle Pfenninger. During those calls, the defendant told Pfenninger, in sum and substance, to lie to law enforcement authorities and falsely testify that the 30-06 rifle and the 12 gauge shotgun did not belong to him and that they were just holding the firearms for the female with the initials C.B. (Dkt. 24 at ¶ 5(h); PSR at ¶¶ 80-81, 86).

After he was charged in federal court, the defendant, among other things, sought to obtain a false affidavit from Oshier stating that Oshier gave the 12 gauge shotgun and box of ammunition to Pfenninger after the defendant was arrested and detained on the parole absconder warrant on October 30, 2020. (Dkt. 24 at ¶ 5(i); PSR at ¶ 87). The defendant also sought a similar false affidavit from C.B. with respect to the 30-06 rifle. (Dkt. 24 at ¶ 5(i); PSR at ¶ 87).   In or about April 2021, the defendant sent a letter from jail to Oshier, stating, in relevant part,

> Everybody moved on and forgot about me its killing me because I can beat this case. Rochelle friend is a notery I need you to make a statement of where ever you got the 12 G saying they gave it to you, you gave it to Rochelle when I went to jail for home protection Nobodys gunna get in trouble you guys are not felons you cant get in trouble none of you are felons only I am and thees guns were not at Rochelles when I was there did I know you guys were bringing them there (yes) and I thank you for doing what you said you were gunna so Rochelle would be safe!! Have the Feds come to speak to you? Or anybody? But anyway I will not have you guys say or do anything to get you in trouble I will go away and do the time but there is a lot of flaws in this case and if you and Crystal be honest and write a statement telling them that yes I asked you for you guys to bring them there after I was arrested so she had

protection because this world is crazy!!   Anyway I hope to here from you I really need you guys to get this done so I can meet my daughter and be the father I was trying to be and goto work[.]

(Dkt. 24 at ¶ 5(j); PSR at ¶ 89).

At the defendant's direction, Pfenninger sought to obtain the false affidavits from C.B. and Oshier. (Dkt. 24 at ¶ 5(k); PSR at ¶ 94). On or about May 27, 2021, Oshier signed a false affidavit stating, in sum and substance, that he brought the 12 gauge shotgun and box of ammunition to 552 Church Road on October 31, 2020. (Dkt. 24 at ¶ 5(k); PSR at ¶ 93). Oshier sent a copy of the false affidavit to Pfenninger over Facebook, and the original false affidavit to Pfenninger through the mail. (Dkt. 24 at ¶ 5(k); PSR at ¶ 93). The defendant's purpose in seeking to obtain the false affidavit from Oshier and C.B., was to obstruct the investigation and prosecution of this case by trying to establish that he did not actually or constructively possess the 30-06 rifle, the 12 gauge shotgun, or the 12 gauge shotgun ammunition, as charged in the Criminal Complaint and the Indictment. (Dkt. 24 at ¶ 5(k); PSR at ¶ 94).

### III.   STATUTORY SENTENCING FACTORS

For the reasons set forth below, the government respectfully asks this Court to impose an above-Guidelines sentence of 120 months' imprisonment, which is the statutory maximum. The government submits that such a sentence is justified and appropriate for this defendant – a convicted violent felon and white supremacist who illegally possessed two firearms and ammunition after stating his intention to shoot and kill protesters and African-Americans at a "genocidal rate," and attempted to obstruct justice – and would not be "greater than necessary" to comply with the objectives set forth in 18 U.S.C. § 3553(a) (hereinafter, "Section 3553(a)").

Section 3553(a) requires that the Court "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]." In determining the appropriate sentence, the Court must consider the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need for the sentence to afford adequate deterrence to criminal conduct; the need for the sentence to protect the public from further crimes of the defendant; the need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

In executing these statutory responsibilities, the Court must first correctly calculate the applicable Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007). This range is "the starting point and the initial benchmark." *Id.* Although this Court must treat the Guidelines as advisory, *United States v. Ratoballi*, 452 F.3d 127, 131-32 (2d Cir. 2006), an error in determining the applicable Guidelines range or the availability of departure authority nonetheless would be the type of procedural error that could render a sentence unreasonable on appellate review. *United States v. Selioutsky*, 409 F.3d 114, 118 (2d Cir. 2005). Further, while this Court "does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," *Rita v. United States*, 551 U.S. 338, 351 (2007), the Second Circuit has observed that "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably

within the broad range of sentences that would be [upheld as] reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006). *See also United States v. Eberhard*, 525 F.3d 175, 179 (2d Cir. 2008).

Next, after giving the parties an opportunity to argue for whatever sentence they deem appropriate (consistent with any limitations imposed by the plea agreement), this Court must then "consider all the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50. In determining whether the section 3553(a) factors support the requested sentence, the Court "must make an individualized assessment based on the facts presented." *Id.* at 50. In that regard, "[n]o limitation shall be placed on the information concerning the background, character and conduct of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. If a non-Guidelines sentence is warranted, the Court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

After settling on the appropriate sentence, the Court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.* (citing *Rita*, 551 U.S. at 351). Although this Court need not engage in "robotic incantations" with respect to its consideration of the section 3553(a) factors, *Fernandez*, 443 F.3d at 30, "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Rita*, 551 U.S. at 356.

13

In this case, the section 3553(a) factors weigh heavily in favor of the maximum prison sentence. Based on the circumstances in this case, the offense committed by the defendant – possession of firearms and ammunition by a convicted felon – is exceptionally serious. The defendant is a convicted violent felon and avowed white supremacist. In the months preceding his acquisition of the firearms and ammunition, the defendant expressed his rage about racial minorities and BLM/ANTIFA, stated that he was ready for a Racial Holy War, and he stated his intent to shoot and kill African-Americans and protesters "at a genocidal rate" in the event they came to his neighborhood.

The defendant is a Criminal History Category (CHC) IV. (PSR at ¶¶ 117-119). His criminal history includes a domestic violence felony and three misdemeanors involving menacing conduct, threats of violence and/or property destruction. (*Id.* at ¶¶ 112, 114-116). Notably, two of his convictions were motivated by racial/ethnic animus, (*Id.* at ¶¶ 112, 114), and one was precipitated by him getting thrown out of a pub after screaming racial slurs. (*Id.* at ¶ 116). The defendant's criminal history demonstrates his capacity for violence and willingness to engage in racially motivated criminal conduct. This criminal history – taken together with the defendant's menacing Facebook posts and messages – show that he represents a true threat to the community, particularly African-American members of the community.

Additionally, the defendant violated probation and parole on several occasions. In 2009, he violated probation by committing new criminal conduct (consisting of threatening to murder another individual and assaulting Rochelle Pfenninger), failing to pay restitution, failing to complete a drug and alcohol evaluation, moving without permission of the

14

probation office, failing to provide proof of employment, and failing to complete a mental health evaluation. (PSR at ¶ 112). The defendant also violated his parole in Missouri on multiple occasions between 2018 and 2019. (*Id.* at ¶ 115). He committed the instant offense while he was wanted on a parole absconder warrant from Missouri. He also committed the Menacing 2° offense in 2018 while on parole. (*Id.* at ¶ 116). The defendant's abysmal performance while under supervision shows that he is unwilling or unable to follow court orders and live a law-abiding life.

Given the circumstances, the government requests a sentence of 120 months' imprisonment. Such a sentence would adequately account for the nature and circumstances of the offense, the criminal history and personal characteristics of the defendant, the seriousness of the offense, and the need to protect the public from further crimes by the defendant. In addition, such a sentence would promote respect for the law and deter the defendant, and others in this District and elsewhere in the United States, from illegally possessing firearms and ammunition, and threatening racial violence.

## IV.   THE DEFENDANT'S OBJECTIONS TO THE PSR

The defendant objects to the inclusion of paragraphs 20 and 38 through 77 of the PSR on the grounds that they summarize Facebook records that are inflammatory and irrelevant to the crime of conviction. (Dkt. 30 at pp. 2-3).

A sentencing court may consider evidence regarding "the defendant's beliefs or associational activity" where it is "'relevant to the issues involved' in the sentencing proceeding." *United States v. Kane*, 452 F.3d 140, 142 (2d Cir. 2006). Such evidence "may be relevant to show motive, analyze a statutory aggravating factor, illustrate future

dangerousness or potential recidivism, or rebut mitigating evidence that the defendant proffers." *Id.* at 143 (citations omitted). The government, however, "may not offer proof of a defendant's 'abstract beliefs' merely for the purpose of demonstrating that those beliefs, and by extension the defendant, are 'morally reprehensible.'" *Id.* (quoting *Dawson v. Delaware*, 503 U.S. 159, 166-67 (1992)).

The government submits that the defendant's objections must be denied for two reasons. First, the Facebook records are relevant because they demonstrate that the defendant was motivated to commit the crime of conviction, at least in part, by his racist and white supremacist beliefs. *See Kapadia v. Tally*, 229 F.3d 641, 648 (7th Cir. 2000) ("[n]othing in the Constitution prevents a sentencing court from factoring a defendant's statements not sentencing when those statements are relevant to the crime charged or to legitimate sentencing considerations"). Second, the Facebook records can be properly considered by this Court "as evidence that he presents a threat of future dangerousness to the community" and lacks respect for the law. *United States v. Schmidt*, 930 F.3d 858, 868 (7th Cir. 2019) (holding that sentencing court could consider the defendant's white supremacist beliefs as evidence of his future dangerousness and disrespect for the law) (internal quotation marks omitted).

Here, the defendant's Facebook records – which include multiple references to a Racial Holy War, and statements about killing African-Americans and protesters – establish that the defendant presents a future threat of danger to the community. Moreover, these Facebook records, "combined with [his] record of repeated violations of law, evince[ ] a willingness to continue on a path of lawlessness in the absence of significant correction." *Schmidt*, 930 F.3d at 868.

V.   <u>CONCLUSION</u>

Based on the foregoing, the government respectfully recommends that the Court impose a sentence of 120 months' imprisonment.

DATED:      Rochester, New York, January 19, 2022.

Respectfully submitted,

TRINI E. ROSS
United States Attorney
Western District of New York

BY:     *s/ Brett A. Harvey*
BRETT A. HARVEY
Assistant United States Attorney
Western District of New York
100 State Street, Suite 500
Rochester, New York
585/399-3949
brett.harvey@usdoj.gov

TO:   Steven G. Slawinski, Esq.
Counsel for Defendant

United States Probation Department
Attn:  Jennifer L. Fish
United States Probation Officer Specialist

17