1

1          UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF NEW YORK

3     - - - - - - - - - - - - - X
      UNITED STATES OF AMERICA,              21-CR-6097
4                    Plaintiff

5               Vs.
      STEPHEN REED PATTISON                  Rochester, New York
6               Defendant                    May 23, 2022
                                             2:30 p.m.
7     - - - - - - - - - - - - - X

8                    TRANSCRIPT OF SENTENCING
                BEFORE THE HONORABNLE DAVID G. LARIMER
9                 UNITED STATES DISTRICT JUDGE

10              U.S. ATTORNEY'S OFFICE
                BY: BRETT A. HARVEY  ESQ.
11              100 State Street
                Rochester, New York 14614
12              Appearing on behalf of the Plaintiff

13

                FEDERAL PUBLIC DEFENDER.
14              BY: STEVEN G. SLAWINSKI  ESQ.
                28 East Main Street
15              Suite 400
                Rochester, New York 14614
16              Appearing on behalf of the Defendant

17

18    CLERK:           Lisa Duque

19

20    COURT REPORTER: Brandi A. Wilkins
                      scalisba@gmail.com
21                    Kenneth B. Keating Federal Building
                      100 State Street, Room 2120
22                    Rochester, New York 14614

23

24

25

1                    **P R O C E E D I N G S**

2                         *     *     *

3              THE CLERK:  The Honorable David G. Larimer

4    presiding.  You may be seated.  United States of

5    America versus Stephen Reed Pattinson, 21-cr-6097.

6              THE COURT:  Good afternoon all.

7              MR. SLAWINSKI:  Good afternoon, Judge.

8              MR. HARVEY:  Good afternoon, Your Honor.

9    (There was a discussion off the record.)

10             THE COURT:  Okay.  So Mr. Slawinski, Mr.

11   Harvey, Mr. Pattinson, good afternoon.  This matter is

12   on for sentencing today.  Based on Mr. Pattinson's

13   plea back on November 8 to Count One of the indictment

14   charging a firearms offense, possession of a firearm

15   by a prohibited person, involved two firearms a .30-06

16   rifle and a 12 Gauge shotgun.  These will be discussed

17   in a minute.  These were found after a search warrant

18   in a bedroom of your home in Hilton, New York.  By

19   statute such an offense carries a potential sentence

20   of up to ten years in prison.

21             There was a thorough presentence -- excuse

22   me, plea agreement.  A plea was entered pursuant to

23   the plea agreement, and the factual basis in this case

24   unlike some others took two and a half pages of the

25   plea agreement, and I've reviewed the plea agreement

1    but it sets forth clearly that Mr. Pattinson was

2    convicted of a crime called domestic assault in the

3    second degree in Missouri.  He received a three year

4    jail term there, was on parole; in fact, was a parole

5    absconder when this event occurred.  So that's the

6    felony conviction that makes this possession of a

7    firearm illegal.

8            As I mentioned, he possessed the two

9    firearms at his home in Hilton.  Appears from the

10   factual basis that the firearms at his request were

11   delivered to him by Mr. Oshier and another individual.

12   The factual basis indicates the several efforts Mr.

13   Pattinson made to obstruct justice by attempting to

14   make it look like others possessed the firearms.  He

15   approached Ms. Pfenninger and Mr. Oshier to give false

16   statements, create false affidavits, and this was an

17   attempt to obstruct justice.  Part of this scheme

18   which is set forth in the factual basis was that Mr.

19   Pattinson acknowledged that as a convicted felon he

20   could not possess firearms but that the other two who

21   had not been convicted felons would not get into

22   trouble for possessing the guns.

23           The Court did order a full presentence

24   report and I've received one, a very thorough report

25   which was revised on January 21 of this year.  There

1      are no surprises relative to the guideline

2      calculation.  The probation officer determined that

3      the base offense level for this possession of weapons

4      under 2K2.1a4A provides for a higher offense level

5      because the felony involved that prohibited Mr.

6      Pattinson from possessing weapons was a crime of

7      violence.  So that base offense level was 20 and the

8      plea agreement the parties agreed under 3C1.1 of the

9      guidelines there should be a two point enhancement for

10      obstruction of justice.  Mr. Pattinson did get the

11      benefit of a three point reduction because he accepted

12      responsibility and pleaded guilty.  So the net is that

13      the guideline calculation for the criminal history for

14      there are of course six sentencing ranges, one through

15      six.  Mr. Pattinson is at not the mid range but just

16      above the mid range at a level four.  Therefore the

17      sentencing guidelines are 46 to 57 months.  That's the

18      same range that as I say was anticipated by the

19      parties in the plea agreement, so there's no surprise

20      in that respect.

21           Of course, as the parties know, the

22      Government has moved for the Court to impose a

23      sentence higher than the guidelines.  That motion was

24      filed December 20, Docket Number 33.  Mr. Slawinski

25      has filed a response to that motion recently on April

1    6.  I've reviewed them all carefully, but before we

2    deal with discussion about that, Mr. Slawinski also

3    filed back in early January objections to the items in

4    the presentence report, and I think we should deal

5    with that first.

6              I guess in the Government's motion for an

7    upward departure, the Government responded to that --

8    those objections as well.  So I think, Mr. Slawinski,

9    as you know that the rules seem to require me to make

10   sure on the record the obvious, that you and your

11   client have received the presentence report.

12             MR. SLAWINSKI:  Yes, Judge.

13             THE COURT:  All right.  And Mr. Pattinson, I

14   must ask you directly, did you receive the report and

15   review it with your lawyer?

16             MR. PATTINSON:  Yes, sir.

17             THE COURT:  All right.  I think at the risk

18   of over -- well, the objections are really two in

19   number.  Mr. Slawinski, you've objected basically to

20   all of the Facebook postings which were Paragraphs 38

21   to 77 as well as Paragraph 20.  You also objected to

22   Paragraphs 88, 90 to 93 which talks about what I'll

23   call the obstruction of justice conduct on the part of

24   Mr. Oshier and Ms. Pfenninger, and then you do

25   specifically make a sentencing recommendation and that

1    is that the Court stick to the 46 to 57 month

2    guideline range.

3            So in reviewing your motion, it seems that

4    the -- really the singular basis for the objection was

5    that all of the Facebook stuff, and there are multiple

6    paragraphs, that in your view it's all irrelevant to

7    the crime that Mr. Pattinson pleaded to, that is

8    possession of these two guns.  Is that the essence of

9    it?

10           MR. SLAWINSKI:  Correct, Judge.

11           THE COURT:  All right.  And we'll deal with

12   the matter relating to the activities of Mr. Oshier

13   and Ms. Pfenninger in a minute but -- so there are no

14   other objections?

15           MR. SLAWINSKI:  That's correct, Judge.

16   It's --

17           THE COURT:  Keep your voice up a little bit.

18           MR. SLAWINSKI:  Oh, sorry.

19           THE COURT:  That mic seems -- okay.

20           MR. SLAWINSKI:  The postings by Mr.

21   Pattinson were done at least two weeks before his

22   arrest and -- or I'm sorry.  At least two weeks before

23   the finding of the firearms.  It's our position that

24   the postings and the messages do not relate to his

25   actual crime of being a felon in possession of two

1    firearms.

2         THE COURT:  Okay.  Well, I just was trying

3    to determine what the objection is and then I was

4    going to let you -- give you a chance to argue it.

5    You've already argued it.  Anything else you wish --

6    your papers thoroughly set forth your argument, but

7    you certainly have an opportunity to say anything more

8    you'd like about that.

9         MR. SLAWINSKI:  No, and that is my argument,

10   Judge.

11        THE COURT:  Okay.

12        MR. SLAWINSKI:  I'll note that the initial

13   presentence report that was prepared did not have the

14   paragraphs relating to the Facebook posts or the

15   social media posts and then the second one did.  I

16   think it came on a day or two later, and it increased

17   the PSR I think by double.  The first one I think was

18   about 17 pages and this one is 39 pages.  So the bulk

19   of the PSR are Mr. Pattinson's Facebook posts and his

20   messaging on social media.

21        THE COURT:  All right.  Well, I acknowledge

22   the new presentence report is some 39 pages long.

23        Mr. Harvey, do you wish to be heard in

24   response to the argument that essentially I guess that

25   the Court should strike or at least not consider all

1    those Facebook comments or rants?

2          MR. HARVEY:  Sure.  Judge, just very

3    briefly.  I did lay out in my original sentencing

4    memorandum the rational for the Court's consideration

5    of those Facebook posts as it relates to sentencing.

6    Our position is that those posts are relevant to

7    issues that are present before this Court in this

8    proceeding.  Specifically, they show the defendant's

9    motive and intent in acquiring and possessing the

10   firearms, and they also show his -- and illustrate his

11   future dangerousness and his potential for recidivism

12   which are all permissible purposes for such evidence

13   to be presented at sentencing.

14          I will note that with respect to the

15   Facebook posts both in the PSR and the Facebook posts

16   and messages that are in my sentencing memorandum

17   which supplement the PSR all of those posts or

18   messages occurred during the three or four months

19   leading up to the defendant's acquisition of the two

20   firearms.  So they weren't remote in time in relation

21   to when he actually took possession of the .30-06

22   rifle and the shotgun, and in fact, the one audio

23   message that is referenced in I think Paragraph 77 of

24   the PSR as included in full and the Government's

25   sentencing memorandum on Page 9 I believe where the

1    defendant refers to killing at a genocidal rate and

2    makes a reference to Josef Mengele.  That conversation

3    between the defendant and Mr. Oshier occurred on the

4    day he took possession of the shotgun and the

5    ammunition.  So there's temporal proximity to all of

6    these communications as they relate to the defendant's

7    motive in taking possession of those firearms and

8    ammunition.

9             THE COURT:  All right.

10            MR. HARVEY:  And I think with respect to the

11   future dangerousness and potential recidivism, I think

12   those are all bases for the court to consider those

13   because if you look at the defendant's criminal

14   history he has prior convictions which involve in some

15   cases racial animus, in other cases actual violence

16   and in other cases threats to kill.  So I think this

17   is all part of what this Court should be able to

18   consider in determining those issues.

19            THE COURT:  Mr. Slawinski, do you want to

20   speak further about the paragraphs relating to Mr.

21   Oshier and Ms. Pfenninger?

22            MR. SLAWINSKI:  Yeah, Judge.  Just to state,

23   you know, we're not objecting to the attempted

24   obstruction as it relates and as it's stated in the

25   presentence report but we don't have any information

1   -- personal information of what Ms. Pfenninger and Mr.

2   Oshier did after they talked to Mr. Pattinson.  It's

3   my understanding that there was an affidavit that was

4   procured by Ms. Pfenninger and Mr. Oshier, but that

5   was never submitted to the police.

6           MR. HARVEY:  Judge, I'm going --

7           THE COURT:  Mr. Harvey?

8           MR. HARVEY:  Just on that note, Judge, I

9   would note that Paragraph 5K of the plea agreement

10  does include some of the facts that are set forth in

11  the paragraphs from the PSR, so the defendant has

12  effectively already admitted to some of the conduct by

13  Ms. Pfenninger and Mr. Oshier as it relates to the

14  obstruction.  So there's probably a mootness argument

15  there as well.  So he's really already admitted the

16  essential facts for finding that enhancement applies.

17          THE COURT:  Yes.  Doesn't seem to be

18  anything new about the paragraphs in the plea

19  agreement -- or on the presentence report since it was

20  covered in the plea agreement.

21          MR. HARVEY:  Right, in large part.

22          THE COURT:  Well, Mr. Slawinski, I'm going

23  to deny your motion to strike these paragraphs.  I

24  think they are relevant in several respects.  First of

25  all, the well known statute Section 3661 which covers

1    sentencing does provide that no limitation shall be

2    placed on the information concerning the background

3    character and conduct of a person convicted in the

4    United States and may be received and considered for

5    the purpose of imposing an appropriate sentence.

6    That's sort of a baseline principle.  In fact, much of

7    it doesn't have to be technically admissible if it has

8    to have some indicia of reliability, but I think these

9    Facebook statements are relevant for several purposes.

10   There's many references to getting firearms.  I

11   counted about seven; Paragraph 51, 58, 59, 62, 65, 74

12   were references by Mr. Pattinson with others to get

13   guns and for sort of a particular purpose.  It wasn't

14   to go duck hunting either.  It was to be prepared in

15   references to this holy war.  So I think to the extent

16   there are two firearms offenses here, you know, if

17   someone were charged as a felon of possessing firearms

18   but he said to me, "Judge, I was just going to use

19   them to go duck hunting with my nephew, "that seems to

20   me to be far different from why these weapons were

21   procured.

22           Second, there were admission on some of

23   these Facebook statements or rants, in Paragraph 56

24   specifically where he admits that he can't possess a

25   firearm.  One of his cohorts asked him that and he

1    said no, I can't.  Also, there's a reference in the

2    Facebook Paragraph 57 which suggests Mr. Pattinson

3    didn't care much about the law or he was talking about

4    if he shot someone he didn't care about the law was

5    important.

6            As to the information about Mr. Oshier and

7    Ms. Pfenninger, Paragraphs 88 to 93, I think these

8    just corroborate and really duplicate information that

9    Mr. Pattinson agreed to in the plea agreement.  It's

10   really nothing new.  And I think finally all of these

11   Facebook matters, or many of them, they do express a

12   certain I would say white supremacist, racist

13   philosophy, but it references other things that I

14   think are truly germane to sentencing.  I understand a

15   person can have white supremacist views and support

16   Nazi philosophy and use racist language.  That's not

17   what Mr. Pattinson is being sentenced for even though

18   those statements are offensive and repugnant.

19           So I think these statements in the Facebook

20   pages they refer to many things that I think are

21   germane in the Court's ultimate decision.  They refer

22   to firearms, assaults or potential assaults on the

23   protestors that were protesting during the Summer of

24   2020.  They relate to the use of violence, all of

25   which I think may be factors for this Court to

13

1     determine in terms of the ultimate sentence.  I mean,

2     the Facebook postings talk about shooting Antifa

3     people, Paragraphs 45 and 57, some reference to Mr.

4     Pattinson beating up such a person, Paragraph 48,

5     statements that we should slaughter anybody bringing

6     communism into the country, threats to kill people if

7     they came into his neighborhood presumably in Hilton

8     and statements that this just doesn't mean to fight

9     them but to shoot them, pump shells through their

10    head.

11          So I deny your request to strike those

12    because for the reason that I stated I think they're

13    relevant and within the broad scope of information the

14    Court can determine whether the sentence should be

15    within the guidelines, less than the guidelines or

16    more than the guidelines.  The rules require that I

17    first off make a determination as to what the

18    sentencing guidelines are, and the plea agreement the

19    parties opined what it should be.  The presentence

20    report has determined that, and I make a determination

21    that the appropriate sentencing guidelines with the

22    criminal history category four is the 46 to 51 months.

23          MR. HARVEY:  Judge, I think it's 46 to 57.

24          THE COURT:  What did I say?

25          MR. HARVEY:  I think you said 46 to 51.

1               THE COURT:  No, no.  Yup.  You're right.  46

2    to 57.  I misspoke.

3               MR. HARVEY:  Thank you.

4               THE COURT:  Let me just find one other note

5    here before we proceed.  As I indicated at the outset,

6    Mr. Harvey on behalf of the Government has requested

7    that the Court impose a sentence greater than the 46

8    to 57.  I would just note that the plea agreement I

9    believe it was Paragraph 13 the parties agree to the

10   correctness of the guideline calculation but both

11   reserve the right to seek a sentence outside the

12   guidelines, and the plea agreement also referenced the

13   well known fact that regardless of what the guidelines

14   are the Court is not bound to accept them but the

15   Court has to make its own determination.

16               So let's get to the decision itself here.

17   I've indicated what the guidelines are.  I should

18   indicate that attached to your objection to Mr.

19   Harvey's request for an upward departure you also

20   included a statement written by Mr. Pattinson, a two

21   page statement which I acknowledge receipt of.  So I

22   think it's time for counsel to speak to the matter.

23   Mr. Pattinson, you also have a right to address me,

24   the sentencing judge.  I have carefully reviewed your

25   letter.  You don't have to make a statement, but if

1    you wish to, you can.  I guess, counsel, in your

2    remarks and you both know this since you've appeared

3    before me scores of time but I think that there's a

4    statute that affects the Court's sentence and that's

5    the so-called sentencing statute, Section 3353A.  Mr.

6    Harvey sort of tripped through that on his discussion.

7    And I think those sections and there are seven or

8    eight are crucial in every sentence but they certainly

9    are here.  The Court is directed to look at the nature

10    and circumstances of the crime.  The Court is directed

11    to look at the history including the prior record and

12    characteristics of this defendant.  The Court is

13    directed to consider the need for this sentence to

14    reflect the seriousness of the offense, to promote

15    respect for law, to provide just punishment,

16    importantly to provide adequate deterrence and also

17    importantly to protect the public from further crimes

18    by the defendant.  So I think that certainly tryst for

19    counsel's discussion.

20            In addition to those factors, the sentencing

21    statute also says the Court should consider and avert

22    to the policy statements of the guidelines, and that

23    suggests at least one and maybe two of the guideline

24    sections may be germane here.  First is 4A1.3 of the

25    guidelines which talks about under 4A1.3A1 a standard

1   for considering an upper departure and that teaches

2   and I quote if reliable information indicates that the

3   defendant's criminal history category substantially

4   under represents the seriousness of his criminal

5   history or the likelihood that the defendant will

6   commit other crimes, an upward departure may be

7   warranted.  So I think this has often been used and

8   must be used.  5K2.0 talks about whether there should

9   be some departure or reasons not sufficiently

10  considered by the framers of the guidelines.  But I

11  think my focus has been on the statute, Section 3553E

12  -- A rather and 4A1.3 which talks about the standard

13  for the upward departure and there's also some

14  guidances to how the Court might examine that.

15          So I guess I would turn it over to counsel

16  at this point.  Mr. Harvey, since you made the motion

17  I guess I will let you go first.  Trust me, I have

18  read your paper numerous times and Mr. Slawinski's

19  response so it's not necessary to repeat everything in

20  there but you may proceed.

21          MR. HARVEY:  Thank you, Judge.  As Your

22  Honor noted, the Government has requested an above

23  guideline sentence of 120 months imprisonment which is

24  the statutory maximum.  The Government understands

25  that that's a significant above guideline sentence,

1    basically double the range, but I think it's warranted

2    in this case, and it is not greater than necessary to

3    achieve the objective of sentencing set forth in

4    Section 3553A.  As I've detailed in my sentencing

5    memorandum, that sentence from my perspective is

6    justified by the nature and circumstances of this

7    offense, this defendant's criminal history and

8    characteristics and the defendant's awful performance

9    while under supervision for previous criminal

10   convictions.  We've touched upon some of that already

11   in the argument on the Facebook post, Judge, but I

12   think it's fair to say that this is a serious case.

13   It involves the illegal possession of firearms and

14   ammunition by a convicted violent felon.  The history

15   of racial animus and the history of adherence to white

16   supremacist ideology.  For those -- the reasons that

17   I've stated earlier the Facebook posts are important

18   in this case, although not the only thing that's

19   important but they are importantly in this case

20   because they tell this Court why the defendant took

21   position of the rifle and the shoot gun and the

22   ammunition, and as Your Honor knows, I've gone through

23   chapter and verse both in my sentencing memorandum and

24   also the PSR about the various racialized threats that

25   this defendant made over Facebook during the three or

1    four months leading up to his possession of these
2    weapons and I'm not going to repeat them here in court
3    because Your Honor is well aware of them and they
4    obviously show an aberrant ideology by this defendant,
5    but it's not for his ideology or his political beliefs
6    or racial beliefs I'm asking the Court to consider
7    those posts.  It's to show why he possessed the gun
8    and to show that purpose was not defensive but was
9    offensive, and I think the best illustration of that
10   is the last Facebook message that is summarized in my
11   sentencing memorandum which is on Page 9 at the bottom
12   of Page 9, and I'm just reading a pertinent part only,
13   Judge.  The part that's highlighted for the Court in
14   the memorandum, it reads as follows:  "Go ahead,
15   nigger.  Defund the police so I can just start fucking
16   murdering you all in a genocidal rate by fucking
17   myself.  They'll be calling me the angel of death.
18   They'll be calling me the new Josef Mengele."  I think
19   that shows, Judge, that this defendant contrary to
20   what was set forth in his sentencing memorandum did
21   not possess these guns or ammunition for a defensive
22   purpose only.  A fair reading of that transcript, of
23   that audio message indicates that he possessed them in
24   an offensive posture and if anybody either African
25   American or Antifa related came onto his street in his

1   neighborhood he was going to kill them all.  So I

2   think it's something the Court should consider very

3   strongly in determining the nature and seriousness of

4   the offense that he's pled guilty to.

5           With respect to his criminal history, as I

6   alluded to earlier, he has four prior criminal

7   convictions, one felony from 2016 and three prior

8   misdemeanors.  All of them -- or excuse me, some of

9   them include aggravating factors such as the

10  following.  Threats to strike and choke his girlfriend

11  and drown her to death and have someone shoot her in

12  the face.  Threats to kill everyone in a house and to

13  kill himself before he goes back to prison.  Others

14  involve yelling white supremacy and racial slurs and

15  ripping down a Mexican flag from somebody's personal

16  property, and another involves calling a victim a

17  racial slur and then damaging and menacing a person

18  after doing so.  These convictions taken together

19  especially with the Facebook posts and messages that

20  we've discussed show this defendant's capacity for

21  violence and his willingness to commit racially

22  motivated criminal conduct, and I think it really

23  colors the background here as to why he possessed

24  these two weapons in this case illegally.  And I think

25  as I mentioned earlier I think that really illustrates

20

1    a couple of things as it relates to the 3353A factors.

2    It illustrates this defendant's disregard for the law.

3    He shows no respect for the law in anything he does.

4    He has all of those convictions but keeps coming back

5    to the same thing, continues to espouse this ideology,

6    continues to commit criminal conduct, ignores orders

7    of the court whether it relates to parole or probation

8    in his cases.  So it really shows a high level of

9    disregard for the law and a significant chance of

10   recidivism by this defendant in the future, and I

11   think that does tie into not only the 3553A factors

12   but also as Your Honor referenced Section 4a 1.3

13   relating to unrepresenting criminal history category.

14   This defendant has a criminal history category four

15   which is not the highest category, but those

16   convictions taken together with his statements about

17   his disregard for the law show that has had no

18   intention of living a law abiding life regardless of

19   what this court does.  So I think it's necessary for

20   this Court to send a message to this defendant that

21   this conduct will not be tolerated going forward and

22   to impose a maximum sentence to prevent him from

23   engaging in this type of conduct in the future.

24              I will note a couple of other things, Judge.

25   In addition to the possession of a weapon and the

1    Facebook posts and messages, I think it shouldn't be

2    lost on this Court that the defendant did try to

3    obstruct justice in this case and in doing so involved

4    his girlfriend and the mother of his children in the

5    process and has put her in legal jeopardy because

6    she's charged here in federal court with offenses

7    relating to that obstruction.  I think the sentencing

8    memo and PSR speak for themselves on that issue, but

9    that's an aggravating factor that should not be lost

10   on this court in determining an appropriate sentence.

11   With respect to one of the other arguments made by

12   defense counsel in their sentencing memo they tried to

13   draw parallels between this defendant and Mr. Oshier

14   who pleaded guilty to transferring a firearm to a

15   convicted felon and is facing a different sentencing

16   range for this defendant.  I just wanted to clarify a

17   few things for the Court with respect to those

18   differences between the plea agreements.  Mr. Oshier

19   is not similarly situated to this defendant.  They're

20   completely different.  Mr. Oshier has no criminal

21   history category.  This defendant has a criminal

22   history category four with a high likelihood of

23   recidivism.  There are differences in their guidelines

24   calculations.  For example, Mr. Oshier was a base

25   offense level of 14 because that is the base offense

1    level for transferring a firearm to a convicted felon

2    while this defendant is a base level 20 due to his

3    prior violent felony conviction.  In addition, Mr.

4    Oshier's plea agreement provided for a five level

5    upward departure for him based on the danger to the

6    community presented by him giving the shotgun and the

7    ammunition to the defendant knowing that the defendant

8    intended -- or wanted the firearm for the purpose of

9    among other things shooting minorities and Antifa

10   protestors.

11           And finally this defendant is getting an

12   upper adjustment for obstruction of justice based on

13   his plan to give the false affidavits to frustrate

14   this prosecution and Mr. Oshier did not qualify for

15   such an enhancement.  So there is no fair comparison

16   between Mr. Oshier's plea agreement and the plea

17   agreement entered by this defendant.  So Judge, unless

18   you have any further questions about my submissions or

19   my arguments I believe that the sentence we've

20   requested complies with the objectives of Section

21   3553A and is a just and appropriate sentence in this

22   case.

23           THE COURT:  All right.  Thank you.  Mr.

24   Slawinski, as you know, you can also make a statement

25   if you wish.  I have read your thorough written

1    report.  Mr. Pattinson may also speak.  I'll turn it

2    over to you and you can decide who goes first, I

3    guess.

4            MR. SLAWINSKI:  Thank you, Judge.  Judge, I

5    think first and foremost the Court needs to consider

6    the crime in this case and that crime is that Mr.

7    Pattinson possessed both a rifle and a shotgun in his

8    home in Hilton, New York.  The shotgun and rifle were

9    retrieved while Mr. Pattinson had already been in jail

10   for two weeks after he was arrested for his Missouri

11   warrant and for coming back here to be with his fiancé

12   and the mother of his child who has since been born

13   since he's been in custody.

14           THE COURT:  Since what?  I didn't hear you.

15           MR. SLAWINSKI:  Oh.  The mother of his

16   child.  He had a child born while he has been in

17   custody.

18           THE COURT:  Okay.

19           MR. SLAWINSKI:  The child is now a year and

20   a half -- almost a year and a half old.  So the Court

21   should consider the crime in this case, and this is a

22   fairly common crime that you see in federal courts

23   that being a 922G.  The firearms involved did not have

24   a large capacity.  They were not machine guns.  They

25   were not semi automatics.  They were simply a rifle

1    and a shotgun.

2           The reason that Mr. Pattinson had these

3    firearms is that he knew that he was going back to

4    jail sooner or later.  He knew that the Missouri

5    warrant was going to catch up with him, and he wanted

6    his fiancé, his girlfriend and their children to be

7    safe when he did that.  So he did procure the weapons,

8    he admitted to that, for their safety, and he did this

9    in the Summer of 2020.  As the Court will recall in

10   the Summer of 2020 there were a lot of protests in

11   Rochester about Black Lives Matter, and there were

12   people on both sides protesting and counter

13   protesting.  Now, Mr. Pattinson was paying attention

14   to the protests, took part in some of the counter

15   protests and was very concerned that the violence

16   would spill over to his neighborhood in Hilton.  Now,

17   whether that concerns --

18           THE COURT:  Which is a long way from

19   Rochester.

20           MR. SLAWINSKI:  It is.  Correct, Judge.

21   There's no evidence that he went into Rochester with

22   any weapons to cause a may lay, to cause violence.  He

23   was concerned about himself and his family.  Now, you

24   know, his beliefs, you know, notwithstanding, you

25   know, that was his main concern, and the Court, you

1    know, could find his beliefs, his racial briefs

2    repugnant and disgusting, but still, they're protected

3    by the first amendment and should not play any part in

4    his sentence.  So the text and the Facebook messages

5    and the social media posts were in themselves

6    defensive.  They were not offensive, and he was

7    worried that his family was at risk while he was going

8    to be in jail.

9          The reason that he has a criminal history

10   Category Four was that -- Mr. Harvey did detail his

11   prior criminal history but he did escape.  He walked

12   away from custody in Missouri to come up here because

13   he was not being given the opportunity to come up here

14   and be with his family.  He had no ties in Missouri.

15   He had asked them several times so he came up here to

16   Hilton to be with his family.  He put two requests in

17   and they were both denied, so he did take it upon

18   himself to come up here.  He admits that and he

19   stepped responsibility for that just like he's

20   accepting responsibility for possessing the firearms.

21          Again, the firearms were found two weeks

22   after he had been arrested for the Missouri warrant,

23   and there was never any allegation that Mr. Pattinson

24   was violent during the Black Lives Matter protests,

25   that he assaulted anyone, and I think the Government

1    even state that's in their sentencing memo.  There was

2    also an issue of Mr. Pattinson's address being on the

3    internet so people knew where they lived.  That's

4    where Ms. Pfenninger lived with their two children.

5            So a lot of this, you know, bloomed or

6    blossomed from the racial protests and the Black Lives

7    Matter protests in 2020.  It's correct that Mr.

8    Pattinson does have a criminal history category of

9    four.  That is the middle of the road here.  I don't

10   think that criminal history category is too low for

11   somebody like Mr. Pattinson.  The Government is well

12   aware that the Court sees people with far more violent

13   crimes and priors in their past and they don't object

14   to their criminal history being too low.  I think that

15   if the Court were to which we're obviously arguing

16   against it would pour gasoline on this fire on the

17   internet.  It would say, you know, we're punishing Mr.

18   Pattinson for his views, for his racial views, and the

19   people who harbor those views I think would be ignited

20   by a sentence that will go above and beyond.  I think

21   that they will say it will be unfair that Mr.

22   Pattinson is being sentenced that way just because of

23   his beliefs.  SO the Court should consider that.  The

24   Court should also consider the fact that, you know, if

25   you send Mr. Pattinson to prison and believe that he

1   is a white supremacist, that's just going to fester.

2   The longer he's in prison the more he's got to be

3   indoctrinated and he's going to come out at some point

4   even worse, and the Government hasn't offered any

5   solution as to how to deal with that because at some

6   point he will be released from prison.  We think that

7   because of the 3553A factors that should be sooner

8   rather than later.  I'll note that the Government is

9   asking for double what the high end of the guideline

10  sentence is here.  I think that that's truly uncalled

11  for in this case, and I think a lot of it has to do

12  with Mr. Pattinson's racial animus here and not the

13  crime for the person himself.  I think, you know,

14  obviously Mr. Pattinson does have a criminal history

15  but if he's placed on supervision if he were to screw

16  up or violate, you know, that would be appropriate and

17  he would receive appropriate punishment at that time,

18  but I don't think that an upward departure of double

19  the guideline -- of double the guideline range here is

20  called for.

21          I did say that Mr. Pattinson is the father

22  of two children.  His newborn, who is a year and four

23  months, he just got to see recently.  Ms. Pfenninger

24  the codefendant in the obstruction issue gave birth

25  shortly after Mr. Pattinson went into prison and he

1    only saw -- he's only had the opportunity to see her

2    one time.  I don't think the Court should treat this

3    like any other 922G1 case.  The guns at issue were not

4    being used in drug trafficking.  They weren't being

5    used in a robbery.  They weren't being used in a crime

6    of violence.  They were simply being used to protect

7    Mr. Pattinson's girlfriend and their children.  Now,

8    whether it was reasonable or not, you know, that's

9    another question, but there's no evidence to show that

10   Mr. Pattinson had any offensive -- had any offensive

11   motive in possessing these firearms.

12          So for all of those reasons, Judge, and for

13   the reasons I stated in my sentencing memo and

14   response to the Government's memo, I would ask for a

15   guideline sentence in this case.  Thank you.

16          THE COURT:  All right.  Thank you.  Mr.

17   Pattinson, you also as I've said several times have a

18   right to speak to me if you wish.  You don't have to

19   because you have written a letter that I have already

20   mentioned but anything you would like to say before

21   the Court pronounces the sentence?  And just keep your

22   voice up because I don't hear too well.

23          MR. PATTINSON:  I would just like to

24   apologize for bringing this all in play here.  I think

25   a lot of things got taken a lot further than they

1    should have and I definitely accept my responsibility

2    and stupidity for what I have done, and I apologize to

3    the Court for that.

4              THE COURT:  All right.  Thank you.  As I

5    mentioned several times, the courts no longer can just

6    impose the sentence in their heart that they think is

7    right.  Back when I started being a judge over 35

8    years ago that was the case.  But now we have

9    sentencing guidelines that are supposed to grade some

10    uniformity and consistency in sentencing both for

11    those who are offenders and for the community, but

12    there are vehicles and ways that a court can either

13    adhere to the guidelines or sentence below or above

14    the guidelines.  And I think the place to start as

15    both parties seem to recognize is the factors, and I

16    must say, Mr. Pattinson, in looking at those factors

17    you don't come out too well in any of them in terms of

18    the nature of the offense, the history and

19    characteristics of your background, the need to

20    provide deterrence and frankly to protect the public.

21              Dealing first with the nature of the

22    offense, a convicted felon possessing firearms is a

23    danger.  Congress has said it's so dangerous that it

24    subjects you to up to ten years in prison.  Your

25    lawyer and you have suggested that you obtained those

 1    weapons for protection of your family.  As far as I
 2    know, there's no evidence that your family was
 3    threatened in Hilton which is many, many, many miles
 4    from where the protest occurred downtown, but if you
 5    carefully look at the Facebook references that have
 6    been cited by the Government and I referenced, a lot
 7    of the references are to getting guns for you if
 8    necessary to use and you talk about shooting people
 9    and threatening to shoot people.  You know, your views
10    about white supremacy and Nazi views, racist language,
11    they sort of factor in too when one considers the
12    purpose for possessing the guns.  Reading the
13    Facebook, possessing those guns and obtaining them
14    seemed to relate pretty closely with objections and
15    disagreement with the protestors that were protesting
16    in various parts of the city.
17            But the next area is the history and
18    characteristics of you and that forces us to look at
19    your criminal history category which is a four, and
20    except for one prior conviction, all of them seem to
21    have demonstrated aspects of the use of violence and
22    many with the racial undertone or animus.  The crime
23    that does not seem to involve that is your crime of
24    driving while intoxicated.  According to the
25    presentence report, police tried to pull you over.

1    You ignored them, led them on a high speed 80 mile an

2    hour chase.  Now, that might not relate to racial

3    animus, but it certainly seems to show a lack of

4    respect for the law and putting others in danger.

5             But look at some of your other records.

6    Admittedly, this was some time ago back in 2009 you

7    pleaded guilty to menacing, criminal mischief and a

8    hate crime.  You received three years probation but

9    then this seems so typical of many of the things

10   you've said and done.  You know, a neighbor who

11   happened to be African American complained at the

12   residence you and others were in the music was too

13   loud, and in addition to calling him nigger, you and

14   others broke his lawn furniture, throw it at his

15   house.  Uncalled for.  Reprehensible.  You're on

16   probation and the allegations are numerous that you

17   engaged in additional conduct, in threats, engaged in

18   a threat to kill another person, failed to pay

19   restitution, failed to complete drug and alcohol

20   treatment.  So that's where we start.

21            A few years later you were -- pleaded guilty

22   to criminal mischief in the fourth degree, received a

23   very modest jail time.  Records there indicate that

24   you and another were walking through the Town of East

25   Rochester yelling statements about white supremacy and

1    then you approached a woman who happened to be

2    Hispanic.  In addition to calling her a spic, you

3    ripped down the Mexican flag she had on her porch and

4    punched her or pushed her in the face and told her "to

5    go back to Clinton" which I assume maybe had some

6    reference to President Clinton.

7            Next, the very serious felony assault

8    conviction, domestic assault where you received a

9    three year sentence, and I almost lost count of the

10   times the violation of parole was issued, at least

11   three times, and you eventually absconded, but the

12   facts of that case also demonstrate a terrible

13   propensity for violence.  Now you grabbed this

14   described as your girlfriend, choked her so that she

15   stopped breathing, threatened to drown her and then

16   when arrested yelled that he was going to have someone

17   come and shoot her in the face.

18           You didn't do too well when you were sent to

19   the Missouri facilities either.  There were at least

20   eight disciplinary infractions there, many of them

21   seemed to involve fights and violence, engaging in

22   physical structure -- struggle three or four times,

23   threats, failing to comply with an order.  Last

24   conviction 2019 pled guilty to menacing in the second

25   degree, a weapons charge, received a modest jail

1    sentence, but there too you were enjoying yourself as

2    well as with others at a pub in Buffalo, began using

3    racial slurs, kicked out of the pub and while outside

4    proceeded to destroy parts of an individual's --

5    presumably a friend's truck, grabbed jewelry from one

6    of the women's neck, pulled out a knife and said, you

7    know, I'm going to kill everybody in this house if I

8    go back to jail.  You know, you receive points under

9    the guidelines.  You know, you commit a felony, you

10   get three points.  You get misdemeanor, you get one.

11   You received points for all of those except maybe the

12   earliest one, but where I think maybe the record here,

13   your criminal record of four doesn't adequately

14   reflect the seriousness of the offense is that, you

15   know, these were crimes of violence.  Many of them

16   tinges of racial animus.  That's different from

17   another misdemeanor, petty larceny.  You know, you

18   stole ten dollars worth of food from a store, you get

19   one point, but these offenses you also get a point but

20   they seem to involve much more serious conduct and

21   frankly the likelihood that you might do something

22   again like that.  There did not appear to be any

23   willingness or ability on your part to stop this

24   conduct.  You know, there's a pattern here.  Respect

25   for the law is another thing the Court must consider,

34

1    and I don't know how I can find that in your case.
2    You've been repeat violations of probation, numerous
3    violations of parole.  You skipped out on parole in
4    Missouri.  You did what you wanted to do.  You wanted
5    to come here.  80 mile an hour flight from the
6    officers on a DWI clearly doesn't demonstrate much
7    respect for law.  Statements on Facebook that you knew
8    you couldn't possess a gun but you did it anyway.  You
9    know, you didn't care if it violated the law.  I think
10   this sentence has to demonstrate that there must be
11   some respect for law.

12           I carefully reviewed your statement and you
13   expressed some remorse.  I quote you said "I couldn't
14   believe some of the stupid crap I was saying."  Well,
15   I might agree with you that it was stupid, but you've
16   done it numerous times.  You claim you were just
17   talking a big game and really didn't mean any of this,
18   but you know, it's easy now that you stand before a
19   sentencing judge to have remorse and to say you're not
20   going to do it again and there was some justification.
21   Someone brought to my attention a quote which I think
22   applies to some extent here.  You may not be familiar
23   with the African American -- famous African American
24   poet and play writ, author, civil rights activist who
25   actually spoke at President Clinton's inauguration.

1    My guess is that's not someone whose works you follow

2    very closely, but she's often quoted as saying the

3    following which I think applies here, especially in

4    light of your statement, and she said and I quote

5    "When somebody shows you who they are, believe them

6    the first time."  When someone shows you who they are,

7    believe them the first time.  And Mr. Pattinson, I

8    think you have shown us repeatedly who you are, what

9    you're capable of based on your prior record and your

10   numerous statements and rantings on Facebook.  So your

11   letter on the eve of sentencing does not mitigate that

12   in my view very much at all.  Violence seems to be

13   your middle name.  In fact, the presentence report

14   reflects that you have a tattoo on your hand that says

15   that word, violence.  So that seems to be your creed.

16   So I'm not convinced that your online threats of

17   violence against people and property were idle ones.

18   Your history includes crimes of violence, menacing,

19   hate speech, race based harassment, trespass, using

20   racial slurs, threatening to have people killed.  The

21   defendant's online embrace of Nazi ideologies, threats

22   to engage in violent attacks, connection with a race

23   war, claims actually that you did assault several

24   protestors involved in the 2020 protests, strongly

25   suggest to me the likelihood that you would and could

36

1    offend again.

2            Certainly, the first amendment protects your

3    right to engage in such in the Court's view repugnant

4    statements that are incompatible with a democratic

5    society.  They relate frankly to the likelihood you

6    might commit offenses again.  Admission of your

7    beliefs may then properly be considered to the extent

8    they indicate future dangers in this courtroom that

9    mitigating evidence.  In my view, sir, the factors

10   that I've discussed here they do warrant a sentence

11   above the 46 to 57 month guideline range.  The

12   Government seeks the maximum sentence here.  The Court

13   believes it must follow the policy statement under

14   4A1.3.  There have been numerous shootings around this

15   country in the past years and many times people ask

16   the question, you know, were there any warning signs

17   or were there any red flags?  I must say, sir,

18   fortunately you did not engage in such conduct, but if

19   so, the warning flags just jump out at you here in

20   terms of racial animus and prior violence.  In my view

21   under 4A1.3, I think your criminal history four does

22   under represent the seriousness of your prior record

23   and the likelihood that you could commit other crimes.

24   I mentioned already, as Mr. Harvey has, your criminal

25   record which involves racially tinged violence but

37

1   violence -- numerous violence -- acts of violence.  It
2   just seems to me, Mr. Pattinson, when things don't go
3   your way especially in view of your world view, you
4   react violently.  You don't just disagree with people.
5   You call them names.  You engage in violence.  You get
6   upset at your girlfriend, you choke her and threaten
7   to kill her.  You get upset when somebody asks you to
8   lower music, you destroy his property.  You see a
9   Spanish person you don't like in East Rochester, you
10  assault her and call her names.  You know, I don't
11  know why the Court and the community has to accept
12  this.  You have shown who you are.  You have been and
13  I think are a danger, sir.  You repeatedly engaged in
14  behavior frankly of a thug.  You've obtained weapons
15  illegally.  I think you obtained them as part of a
16  racist agenda.  You've been convicted of violent
17  crimes in the past, not just non violent crimes.  You
18  failed to follow directive of courts in terms of
19  probation and supervised release.  You threatened to
20  kill and shoot others, and you just don't -- you just
21  don't get a pass here, Mr. Pattinson.
22          So for all these factors, I've tried to
23  follow the policy statement which teaches you to look
24  sort of sequentially at the criminal history category.
25  Mr. Pattinson has a criminal history category four.

1    The courts also say you don't have to go through a

2    mechanistic formula, but you should say well, would

3    criminal history five better reflect the criminal

4    history or a six, and I believe in this case criminal

5    history at the top which is six is applicable, and

6    I've gone up two offense levels too from a 19 to a 21.

7    All this means is that range would be 77 to 96 months.

8    The Government has asked for a greater departure, but

9    the Court hereby after all these factors which I've

10   tried to articulate an upward departure of 96 months,

11   and that is the sentence I hereby impose upon you.

12   This is over three years more than the top of the

13   guideline range, but I think it's absolutely justified

14   in this case, sir.  I mentioned Maya Angelou.  You

15   might actually learn something by reading some of what

16   she has written.  You claim in your letter to me that

17   you're going to take classes in jail, and I think

18   you've got a lot of things to deal with, anger

19   management frankly being one of them.  So for the

20   reasons I said as I tried to articulate my feeling

21   here, I hereby commit the Stephen Pattinson to the

22   custody of the Bureau of Prisons and the Attorney

23   General for a period of 96 months.  I depart -- I

24   grant the Government's motion and depart.  When you

25   finish your bid, finish your sentence, I place you on

1    supervised release for a period of three years, and

2    these are most crucial, sir.  If you show the same

3    disregard for these conditions, you're going to be

4    back in front of me or some other judge and you could

5    continue your stay in jail and your children will be

6    much, much older.  While on supervised release in part

7    you can't possess, use, distribute any illegal drugs.

8    You can't possess a firearm or even a bullet.  You

9    must submit to random drug testing and you must

10   cooperate in the collection of a DNA sample for the

11   probation office, and the presentence investigation

12   report listed several recommended special conditions.

13   I adopt most of them, specifically recommendation

14   number one that while on supervised release you

15   participate in a program for substance abuse including

16   testing and treatment according to the exact language

17   in that recommendation.  I also direct recommendation

18   number two that you participate in a mental health

19   treatment program including a mental health evaluation

20   and treatment and comply with any program directed by

21   your probation officer according to the specific

22   language of this recommendation.  You also -- I order

23   you to submit to a search of your person, property,

24   vehicle, place of residence to make sure you're

25   complying with these conditions and not possessing

1    guns or weapons.  You must notify probation of any

2    opiate based pain medication before the prescription

3    is filled.  Looking at the presentence report, you've

4    had history of drug abuse and use in your past, not so

5    much recently but in your past.  Next, you must comply

6    -- and that's listed in paragraph 148 of the

7    presentence report.  Next, you must comply with all

8    orders of protection issued against you and there have

9    been several.  I've reviewed your financial

10   circumstances and I declined to impose a fine in this

11   case.  I do -- I must order a $100 special assessment

12   which is due immediately and will be withdrawn from

13   any monies you receive according to the Bureau of

14   Prisons financial responsibility program.  There was

15   the firearms.  There was a provision in the plea

16   agreement that they would be forfeited, and I ordered

17   that forfeiture.  Those firearms will not be returned

18   to you or anyone else.  Two --

19          MR. HARVEY:  Your Honor, I'm sorry to

20   interrupt, but that forfeiture includes the shotgun

21   ammunition as well.

22          THE COURT:  I thought I said that, but yes.

23   The shotgun and ammunition.

24          MR. HARVEY:  Thank you.

25          THE COURT:  Two other things.  I don't think

41

1   there was another count on the indictment.

2           MR. HARVEY:  There was not, Judge.

3           THE COURT:  All right.  I don't know, Mr.

4   Slawinski, if there's any recommendation that this man

5   serve his sentence in any particular locale.

6           MR. SLAWINSKI:  Yes, Judge.  As close to

7   Rochester as possible to maintain --

8           THE COURT:  All right.  I'll order -- or

9   I'll ask the Bureau of Prisons to do that, and of

10  course, it's up to the Bureau of Prisons.  I should

11  say Mr. Pattinson will get credit for the time he has

12  been in custody.  I think he lapsed in the federal

13  custody after the parole matter was taken care of in

14  Missouri.  Next appeal on the plea agreement did

15  provide that Mr. Pattinson gave up or waived his right

16  to appeal if the sentence was within the guideline

17  range.  This sentence obviously is not within the

18  guideline range, so he does have a right to appeal.

19  Mr. Slawinski, that appeal must be filed within 14

20  days of the judgment which will be when I sign the

21  document which will occur in a day or so.  Can I trust

22  you to file the notice of appeal?

23          MR. SLAWINSKI:  Of course, Judge.

24          THE COURT:  All right.  If not, certainly if

25  that doesn't happen and I'm sure it will, Mr.

```
1   Slawinski will do that, but if not, Mr. Pattinson, you
2   can ask the Court to make sure the appeal gets filed
3   and I will take care of that, but I have confidence in
4   Mr. Slawinski.
5           So Mr. Pattinson, this has not been a pretty
6   picture.  You've shown yourself who you are and I
7   don't know, prison certainly can harden one's views,
8   but I have had some success stories where individuals
9   go in hardened, angry and bitter but the Bureau of
10  Prisons does have programs to make your future better.
11  You have no high school degree, no GED.  You know,
12  your prospects for getting a job, which you don't have
13  now, are pretty slim.  So it's up to you.  You could
14  spend your time feeling sorry for yourself and in the
15  weight room or doing something positive.  That's the
16  sentence.  Thank you.
17          MS. FISH:  Judge, if I may just clarify
18  briefly.  The Court granted an upward departure for
19  inadequacy of criminal history from a category four to
20  a six.  We went from a total offense level of 19 to a
21  22.  I just want to clarify that as a variance under
22  the 3553A factors.
23          THE COURT:  19 to 21 is what I said.
24          MS. FISH:  Sorry.  I misread that.  19 to a
25  21, and that's a variance under the 3553A factors that
```

43

1     the Court detailed on the record.

2              THE COURT:  That's what I did.

3              MS. FISH:  Okay.  Thanks, Judge.

4              (Proceeding concluded at 3:23 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **<u>CERTIFICATE OF COURT REPORTER</u>**

2

3              I certify that this is a true and accurate

4     record of proceedings in the United States District

5     Court for the We stern District of New York before the

6     Honorable David G. Larimer on May 23, 2022.

7

8     <u>S/ Brandi A. Wilkins</u>

9     Brandi A. Wilkins

10    Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25