IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.                                                    21-CR-6097-DGL

STEPHEN REED PATTISON,

                    Defendant.

---

<u>GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM</u>

The United States of America, by and through its attorneys, Trini E. Ross, United States Attorney for the Western District of New York, and Brett A. Harvey, Assistant United States Attorney, hereby makes and files its supplemental sentencing memorandum relating to the resentencing of the defendant, STEPHEN REED PATTISON.

## I.    <u>INTRODUCTION</u>

This case is back before the Court for resentencing. At the original sentencing, the government asked the Court to sentence the defendant – a convicted violent felon and avowed white supremacist – to the statutory maximum of 120 months' imprisonment. This request was based on, among other things, the defendant's possession of two firearms and ammunition; his significant criminal history involving domestic violence and racial animus; his threats to kill Black people and individuals/groups who were protesting, and in some cases rioting, over the deaths of George Floyd and Daniel Prude in 2020; and his attempts to obstruct justice. The Court imposed an upward departure based on the inadequacy of the defendant's Criminal History Category (CHC) and sentenced him to 96 months' imprisonment, more than double the low end of the Guidelines range.

While this case was pending appeal, the defendant committed another violent crime, this time at a high-security prison where he was serving his sentence. As detailed, *infra*, the defendant viciously attacked another inmate and slashed him in the face with a makeshift razor blade weapon because the inmate was selling homemade weapons to another race. The attack left the inmate with a 10- to 12-centimeter laceration across the right side of his face and caused significant bleeding. This new racially-tinged crime – taken together with the other aggravating factors highlighted by the government and the Court at the original sentencing – warrants the statutory maximum sentence of 120 months' imprisonment.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    PROCEDURAL HISTORY

On November 25, 2020, the defendant was charged in Criminal Complaint No. 20-MJ-4223 with possession of firearms by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (Dkt. 1). A federal grand jury returned Indictment No. 21-CR-6097, which charged the defendant with one count of possession of firearms and ammunition by a convicted felon, on June 10, 2021. (Dkt. 14).

On November 8, 2021, the defendant pleaded guilty, pursuant to a written plea agreement, to the sole count of the Indictment. (Dkt. 24). In the plea agreement, both parties agreed to the Guidelines calculations and reserved the right to request a non-Guidelines sentence. (*Id.* at ¶ 13). In the Second Revised Pre-Sentence Investigation Report (Second Revised PSR), the Probation Office calculated the same Guidelines calculations as those contained in the plea agreement and concluded that the defendant's CHC was IV and total offense level was 19. (Second Revised PSR at ¶¶ 99-108, 119, 131).

Before sentencing, the government filed a sentencing memorandum requesting the statutory maximum sentence of 120 months' imprisonment. (Dkt. 33).[1] In support of its request, the government relied on the defendant's significant criminal history (including his prior criminal convictions and multiple probation/parole violations), the nature and circumstances of the offense (including, *inter alia*, the defendant's possession of firearms and ammunition, his numerous white supremacist and threatening Facebook posts, and his threats to kill Black people and protesters), and the defendant's efforts to obstruct justice by telling his then-girlfriend to lie to law enforcement authorities and seeking to obtain false exculpatory affidavits from the two individuals who gave him the firearms. (*Id.* at 3-11).

On May 23, 2022, the parties appeared before the Court for sentencing. The Court found that the defendant's CHC was inadequate and imposed an upward departure under U.S.S.G. § 4A1.3(a). (T 36-38).[2] In making this finding, the Court noted, *inter alia*, that almost all of the defendant's prior criminal convictions involved "the use of violence and many with [a] racial undertone or animus" (*Id.* at 30); that the defendant engaged in a "pattern" of criminal conduct showing his lack of respect for the law (*Id.* at 33-34); that "violence seems to be [the defendant's] middle name" (*Id.* at 35); that the defendant has "repeatedly shown" who he is and "what [he's] capable of based on [his] prior record and [his] numerous statements and rantings on Facebook" (*Id.*); and the defendant's "history includes crimes of violence, menacing, hate speech, race based harassment, trespass, using racial slurs, threatening to have people killed." (*Id.*). The Court ultimately stated:

---

1 The government incorporates the original sentencing memorandum by reference as if fully set forth herein and relies on the facts and arguments contained in that memorandum for purposes of resentencing.

2 All references to the sentencing transcript will be denoted by the shorthand reference "T".

It just seems to me, Mr. Pattison, when things don't go your way especially in view of your world view, you react violently. You don't just disagree with people. You call them names. You engage in violence. You get upset at your girlfriend, you choke her and threaten to kill her. You get upset when somebody asks you to lower music, you destroy his property. You see a Spanish person you don't like in East Rochester, you assault her and call her names. You know, I don't know why the Court and the community has to accept this. You have shown who you are. You have been and I think are a danger, sir. You repeatedly engaged in behavior frankly of a thug.

(*Id.* at 37). After increasing the defendant's CHC to VI and departing upward two levels to offense level 21, the Court sentenced him to 96 months' imprisonment. (*Id.* at 38).

The defendant subsequently appealed his sentence to the United States Court of Appeals for the Second Circuit. In January 2024, the Second Circuit vacated the judgment, concluding that the defendant did not receive sufficient notice that the Court was considering an upward departure under U.S.S.G. § 4A1.3(a), and remanded the case for resentencing. *United States v. Pattison*, 2024 WL 191373 (2d Cir. Jan. 18, 2024).

On February 22, 2024, the Court issued an order, pursuant to Fed. R. Crim. P. 32(h), informing the parties that it is "contemplating a departure of the Sentencing Guidelines, specifically under Guidelines § 4A1.3, that [the defendant's] criminal history underrepresents the seriousness of his prior record and especially the likelihood that he will reoffend again." (Dkt. 52).

In a Fifth Revised Pre-Sentence Investigation Report (Fifth Revised PSR), the Probation Office calculated different Guidelines calculations than those contained in the original plea agreement. Specifically, the defendant is now a CHC III due to an intervening amendment to U.S.S.G. § 4A1.1(e). (Fifth Revised PSR at ¶¶ 122-124, 135). The new Guidelines sentencing range is 37 to 46 months' imprisonment. (*Id.* at ¶ 134).

4

**B.**    <u>NEW CRIMINAL CONDUCT</u>

While serving his sentence in federal prison, the defendant committed a vicious assault against another inmate because the inmate was selling weapons to the "another race." In October 2023, the defendant was serving his sentence at United States Penitentiary McCreary (USP McCreary), which is a high-security prison in Kentucky. On October 20, 2023, the defendant, and an inmate with the initials W.S., attacked and assaulted an inmate with the initials E.S. in their housing unit. (Fifth Revised PSR at ¶ 20). During the attack, the defendant used a "homemade razorblade" to slash E.S., while W.S. struck E.S. with a sock "filled with pieces of old locker handles." The defendant's weapon consisted of a toothbrush handle with two razorblades melted into one end. (*Id.*). A prison employee interceded and ordered the defendant and W.S. to stop. Both the defendant and W.S. complied. Below are photographs of the weapons used by the defendant and W.S.





As a result of the attack, E.S. sustained a 10- to 12-centimeter laceration along the right side of his face, stretching from the bottom of his ear to the area near his mouth. (Fifth Revised PSR at ¶ 20). The laceration was approximately two centimeters wide at its widest point and had "nicked" a vein under his ear, which caused significant bleeding. (*Id.*). E.S. was sent to a local hospital for treatment. Below are photographs of E.S. after the attack.





After the attack, a member of the prison staff interviewed the defendant. When asked what caused the assault, the defendant stated, "That guy [E.S.] was selling homemade weapons to another race. That doesn't go over well with the guys in the unit. It was my time to put in work (assault), so that's what I did." (Fifth Revised PSR at ¶ 20). A report from USP McCreary states that the defendant indicated that his peers view E.S. "as a liability and no longer welcome[ ] him in general population." (*Id.*). W.S. also told prison staff, "We had to put in work on that dude [E.S.]. He was selling stuff to another race in our unit. If you run with a group, you cannot sell or hang out with a different group, you know."

### III.   STATUTORY SENTENCING FACTORS

### A.   APPLICABLE LAW

For the reasons set forth below, the government respectfully asks this Court to impose the statutory maximum sentence of 120 months' imprisonment. Such a sentence is justified

and appropriate for this defendant – a convicted violent felon and white supremacist who illegally possessed two firearms and ammunition after stating his intention to shoot and kill protesters and Black people at a "genocidal rate," attempted to obstruct this prosecution, and committed a vicious, armed assault while in federal prison – and would not be "greater than necessary" to comply with the objectives set forth in 18 U.S.C. § 3553(a) (hereinafter, "Section 3553(a)").

Section 3553(a) requires that the Court "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]." In determining the appropriate sentence, the Court must consider the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need for the sentence to afford adequate deterrence to criminal conduct; the need for the sentence to protect the public from further crimes of the defendant; the need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

In executing these statutory responsibilities, the Court must first correctly calculate the applicable Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007). This range is "the starting point and the initial benchmark." *Id.* Although this Court must treat the Guidelines as advisory, *United States v. Ratoballi*, 452 F.3d 127, 131-32 (2d Cir. 2006), an error in

determining the applicable Guidelines range or the availability of departure authority nonetheless would be the type of procedural error that could render a sentence unreasonable on appellate review. *United States v. Selioutsky*, 409 F.3d 114, 118 (2d Cir. 2005). Further, while this Court "does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," *Rita v. United States*, 551 U.S. 338, 351 (2007), the Second Circuit has observed that "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be [upheld as] reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006). *See also United States v. Eberhard*, 525 F.3d 175, 179 (2d Cir. 2008).

Next, after giving the parties an opportunity to argue for whatever sentence they deem appropriate (consistent with any limitations imposed by the plea agreement), this Court must then "consider all the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50. In determining whether the section 3553(a) factors support the requested sentence, the Court "must make an individualized assessment based on the facts presented." *Id.* at 50. In that regard, "[n]o limitation shall be placed on the information concerning the background, character and conduct of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. If a non-Guidelines sentence is warranted, the Court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

After settling on the appropriate sentence, the Court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of

fair sentencing." *Id.* (citing *Rita*, 551 U.S. at 351). Although this Court need not engage in "robotic incantations" with respect to its consideration of the section 3553(a) factors, *Fernandez*, 443 F.3d at 30, "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Rita*, 551 U.S. at 356.

In determining an appropriate sentence, a court may vary and/or depart from the applicable Guidelines range. A "departure refers only to non-Guidelines sentences imposed on the basis of factors *within* the framework set out in the Guidelines, whereas a variance is a modification of the applicable Guidelines sentence that a District Court may find justified under sentencing factors *extrinsic* to the Guidelines – namely, those set forth in 18 U.S.C. § 3553(a)." *United States v. Sealed Defendant One*, 49 F.4th 690, 697 (2d Cir. 2022) (alterations adopted) (internal quotation marks and citation omitted). *See also United States v. Anati*, 457 F.3d 233, 236-37 (2d Cir. 2006) ("A departure results from a circumscribed opportunity to sentence above or below the range based on specific considerations. A non-Guidelines sentence results from a somewhat broader opportunity to sentence above or below that range based on a consideration of the factors outlined in section 3553(a)."), *abrogated on other grounds by Irizarry v. United States*, 553 U.S. 708, 713 n.1 (2008). "Therefore, even if certain facts are sufficient to warrant an adjustment or departure under the Guidelines, those same facts, either in isolation or in combination with other facts, can still be used to support a variance under the applicable Section 3553(a) factors." *United States v. Jordan*, 2024 WL 2764399, at *3 (2d Cir. May 30, 2024) (citations omitted).

In this case, the Court has notified the parties that it is considering an upward departure under U.S.S.G. § 4A1.3(a)(1). Section 4A1.3(a)(1) provides that "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted." In cases where a court finds an upward departure is appropriate, "the court shall determine the extent of a departure . . . by using, as a reference, the criminal history category applicable to defendants whose criminal history or likelihood to recidivate most closely resembles that of the defendant's." U.S.S.G. § 4A1.3(a)(4)(A). Where a court seeks to upwardly depart beyond CHC VI, the court "should structure the departure by moving incrementally down the sentencing table to the next higher offense level in Criminal History Category VI until it finds a guideline range appropriate to the case." U.S.S.G. § 4A1.3(a)(4)(B).

"A sentencing court considering an upward departure under [section] 4A1.3 is not required . . . to pause at each category above the applicable one to consider whether the higher category adequately reflects the seriousness of the defendant's record" before determining an appropriate sentence. *United States v. Simmons*, 343 F.3d 72, 78 (2d Cir. 2003). "[A]s long as the reasons for such a departure are fully explained, a mechanistic, step-by-step procedure is not required." *Id.* (internal quotations marks omitted).

**B.    LEGAL ARGUMENT**

In this case, the facts and circumstances of the offense and the defendant's history and characteristics warrant an upward departure under U.S.S.G. § 4A1.3(a) and the statutory maximum sentence of 120 months' imprisonment. Alternatively, the § 3553(a) factors justify

an upward variance and the statutory maximum sentence of 120 months' imprisonment. Because the analyses for the upward departure and upward variance involve the same facts and circumstances, the government will address them together.

The offense committed by the defendant – possession of firearms and ammunition by a convicted felon – is exceptionally serious. The defendant is a convicted violent felon and avowed white supremacist. In the months preceding his acquisition of the firearms and ammunition, the defendant, *inter alia*, expressed his rage about racial minorities and Black Lives Matter (BLM)/ANTIFA, stated that he was preparing and ready for a Racial Holy War, and stated his intention to shoot and kill Black people and protesters "at a genocidal rate" in the event they came to his neighborhood.

The defendant is a CHC III. (Fifth Revised PSR at ¶¶ 122-124). His criminal history includes a domestic violence felony and three misdemeanors involving menacing conduct, threats of violence and/or property destruction. (*Id.* at ¶¶ 117, 119-121). Notably, two of his prior convictions were motivated by racial/ethnic animus, (*Id.* at ¶¶ 117, 119), and one was precipitated by him getting thrown out of a pub after screaming racial slurs. (*Id.* at ¶ 121). The defendant's domestic violence felony involved the defendant choking his then-girlfriend so hard that she was unable to breathe and threatening to drown and smother her to death. (*Id.* at ¶ 120). At the time of his arrest in that case, the defendant also threatened to have his cousin shoot the victim in the face. (*Id.*). The defendant's criminal history clearly demonstrates his capacity for violence and willingness to engage in racially motivated criminal conduct. This criminal history – taken together with the defendant's racist and threatening Facebook posts and messages – show that he represents a true threat to the community.

Additionally, the defendant violated probation and parole on several occasions over the last 15 years. In 2009, he violated probation by committing new criminal conduct (consisting of threatening to murder another individual and assaulting his then-girlfriend, Rochelle Pfenninger), failing to pay restitution, failing to complete a drug and alcohol evaluation, moving without permission of the probation office, failing to provide proof of employment, and failing to complete a mental health evaluation. (Fifth Revised PSR at ¶ 117). The defendant also violated his parole in Missouri on multiple occasions between 2018 and 2019. (*Id.* at ¶ 120). He committed the instant offense while he was wanted on a parole absconder warrant from Missouri. He also committed the Menacing 2° offense in 2018 while on parole. (*Id.* at ¶ 121). The defendant's abysmal performance while under supervision shows that he is unwilling and/or unable to follow court orders and live a law-abiding life.

Perhaps most importantly, the defendant committed yet another race-related crime while imprisoned at USP McCreary. As detailed above, the defendant and W.S. attacked E.S. because he was selling weapons to another race. During the attack, the defendant slashed E.S. with a makeshift weapon, leaving E.S. with a 10- to 12-centimeter laceration across the right of his face and causing significant bleeding. It is reasonable to infer from the defendant's statements to prison staff that the attack stemmed from the defendant's involvement with a white prison gang, and that the defendant committed the assault as retribution for E.S.'s dealing with another race. The defendant's commission of this vicious racially-tinged assault confirms the Court's assessment of the defendant at the original sentencing – that the defendant is an unrepentant violent criminal, who is motivated by racial animus, has no respect for the law, and poses a real danger to the community. Moreover, the fact that the

defendant committed this crime while in custody at a high-security prison shows that his contempt for the law knows no bounds and the near certainty that the defendant will commit more crimes in the future.

Given these facts and circumstances, the government requests that the Court either: (1) grant an upward departure under U.S.S.G. § 4A1.3(a) to CHC VI and offense level 24 and impose a sentence of 120 months' imprisonment; or (2) vary upward from the Guidelines sentencing range and impose a sentence of 120 months' imprisonment. Such a sentence would adequately account for the nature and circumstances of the offense, the criminal history and personal characteristics of the defendant, the seriousness of the offense, and the need to protect the public from further crimes by the defendant. In addition, such a sentence would promote respect for the law and deter the defendant, and others in this District and elsewhere in the United States, from illegally possessing firearms and ammunition, threatening racial violence, and committing violent crimes in federal prison.

## IV.    THE DEFENDANT'S OBJECTIONS TO THE FIFTH REVISED PSR

The defendant objects to certain portions of ¶¶ 26, 29, 46, 48, 50, 52-55, 58-59, 62-66, 72-79, 82, 84, and 86 of the Fifth Revised PSR, arguing that those portions should not be considered by the Court because they are not based on reliable sources, are irrelevant to sentencing, and/or contain conclusions or interpretations that are unnecessary and/or subjective. (Dkt. 61).[3] In addition, the defendant restates his original objections to the

---

3  In his most recent sentencing statement, the defendant lodged objections to the Fourth Revised PSR (which was in effect at the time). Today, the Probation Office issued the Fifth Revised PSR. It is my understanding that the paragraph numbers in the Fifth Revised PSR are the same as those in the Fourth Revised PSR.

inclusion of the Facebook posts and messages in the Second Revised PSR (now the Fifth Revised PSR), arguing that those posts and messages are "inflammatory" and "irrelevant." (Dkt. 30).[4] As detailed below, the disputed portions of the Fifth Revised PSR are reliable, relevant to sentencing, and comfortably within the broad scope of information the Court can rely upon in imposing sentence.

Title 18, United States Code, Section 3661 "codifies the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" in imposing sentence. *United States v. Watts*, 519 U.S. 148, 151 (1997). It provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for purposes of imposing an appropriate sentence." 18 U.S.C. § 3661. To effectuate § 3661, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *Dawson v. Delaware*, 503 U.S. 159, 164 (1992) (internal quotation marks omitted).

The scope of a district court's sentencing inquiry must encompass a defendant's "history and characteristics," as required by 18 U.S.C. § 3553(a)(1). And, as the Second Circuit has explained, it is "self-evident" that "a person's history and personal characteristics can often be assessed by a sentencing court only or principally through analysis of what that person has said – in public, in private, or before the court." *United States v. Stewart*, 686 F.3d 156, 166 (2d Cir. 2012).

---

4 The defendant has incorporated these objections by reference in his most recent sentencing statement. (Dkt. 61).

The First Amendment imposes an outer limit on the broad authority granted to district courts in § 3661 and the nature of a court's inquiry under § 3553(a). *Stewart*, 686 F.3d at 166 (noting an "apparent tension" between § 3553(a)(1) and the First Amendment's "general[ ] assur[ance]" that the federal and state government will not encroach upon citizens' freedom of speech). As the Second Circuit has explained, "[t]he First Amendment forbids the *uncabined* reliance on a defendant's abstract beliefs at sentencing." *United States v. Fell*, 31, F.3d 197, 228 (2d Cir. 2008) (internal quotation marks omitted). But the First Amendment "does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Dawson*, 503 U.S. at 165. Rather, "[a] sentencing court may consider such evidence [of a defendant's beliefs and associations] so long as it is relevant to the issues involved in the sentencing proceeding." *United States v. Kane*, 452 F.3d 140, 142 (2d Cir. 2006) (per curiam) (internal quotation marks omitted). "Among other possible uses," such evidence "may be relevant to show motive, analyze a statutory aggravating factor, illustrate future dangerousness or potential recidivism, or rebut mitigating evidence that the defendant proffers." *Id.* at 143 (citations omitted).

At the original sentencing, the Court denied the defendant's motion to strike the Facebook posts and messages from the Second Revised PSR, finding that such information was "relevant in several respects" to the offense of conviction. (T 10). First, they contain references to the defendant obtaining firearms to prepare for a "holy war." (*Id.* at 11). Second, in some of the Facebook messages, the defendant acknowledged that he could not legally possess a firearm. (*Id.* at 11-12). The Court also ultimately found:

16

So I think these statements in the Facebook pages they refer to many things that I think are germane in the Court's ultimate decision. They refer to firearms, assaults or potential assaults on the protestors that were protesting during the Summer of 2020. They relate to the use of violence, all of which I think may be factors for this Court to determine in terms of the ultimate sentence. I mean, the Facebook postings talk about shooting Antifa people . . . some reference to Mr. Pattinson [sic] beating up such a person . . . statements that we should slaughter anybody bringing communism into the country, threats to kill people if they came into his neighborhood presumably in Hilton and statements that this just doesn't mean to fight them but to shoot them, pump shells through their head.

So I deny your request to strike those because for the reason that I stated I think they're relevant and within the broad scope of information the Court can determine whether the sentence should be within the guidelines, less than the guidelines or more than the guidelines.

(*Id.* at 12-13).

The Court's prior rationale for considering the Facebook evidence still applies. The defendant's statements on Facebook are directly relevant to two sentencing issues: first, the defendant's motive for the possessing the firearms and ammunition, that is, to potentially kill Black people and protesters, and prepare for a Racial Holy War; and second, to demonstrate the defendant's future dangerousness and potential for recidivism. *See United States v. Miner*, 2022 WL 7214447, at *2 (2d Cir. Oct. 13, 2022) (holding, in a firearm possession case, that defendant's "racist, anti-Semitic, and violent statements online" were relevant to "motive and potential for violence to the community – two considerations [the Second Circuit] has upheld as permissible and relevant to sentencing") (citing *Stewart*, 686 F.3d at 170, and *United States v. Brown*, 479 F.2d 1170, 1174 (2d Cir. 1973)); *United States v. Schmidt*, 930 F.3d 858, 868 (7th Cir. 2019) (holding, in a firearm possession case, that a sentencing court could consider defendant's white supremacist beliefs as evidence of his future dangerousness and disrespect for the law) (internal quotation marks omitted). Here, the defendant's Facebook records –

which include multiple references to a Racial Holy War, and statements about killing Black people and protesters – establish that the defendant presents a future threat of danger to the community, especially given the defendant's recent commission of another racially-motivated violent crime while in prison. Moreover, these Facebook records, "combined with [his] record of repeated violations of law, evince[ ] a willingness to continue on a path of lawlessness in the absence of significant correction." *Schmidt*, 930 F.3d at 868.

Many of the disputed paragraphs of the Fifth Revised PSR contain informed opinions by the investigating agents about the meaning of certain Facebook posts and messages, Discord messages, and jail telephone calls involving the defendant. The underlying content of the posts, messages, and jail telephone calls are quoted and summarized in the Fifth Revised PSR. (*See*, *e.g.*, Fifth Revised PSR at ¶¶ 48, 50, 52-54, 58-59, 62-65, 69, 72, 75-77, 79, 84, 86). It is apparent from the content of the posts, messages, and jail telephone calls that the agents' opinions are fair, accurate, and reliable. Nonetheless, the Court is free to review such content to determine whether the agents' opinions are accurate and reliable and, if so, whether those opinions will impact the sentence imposed by the Court.

In any event, some of the opinions challenged by the defendant do not relate to contested issues in this case. For example, the defendant challenges a sentence in the Fifth Revised PSR, which states that use of the symbols "14" and "88" signifies an endorsement of white supremacist ideology. (Dkt. 61 at 2, 11). The evidence of the defendant's embrace of white supremacist ideology is overwhelming: the defendant's tattoos include a battle shield with the numbers "1488," the phrase "Too White For U," and the term "White Warrior" (Fifth Revised PSR at p. 3); the search of the defendant's bedroom at his residence yielded

18

white supremacist and Nazi paraphernalia, and depictions of white supremacist and Nazi imagery (*Id.* at ¶ 37(h)); the defendant's Facebook posts and messages are rife with white supremacist imagery (including, but not limited to, the numbers "14" and "88," "SS" lightning bolts, Nazi imagery, and references to the Racial Holy War (RAHOWA)); the defendant's cell phone case bore the numbers "14" and "88," the Nazi "SS" symbol, and a white power crosshair symbol (*Id.* at ¶ 39); the defendant's cell phone contained, *inter alia*, an image that read, "White Lives Matter More," and a photograph of the defendant posing with a firearm in front of a flag bearing the numbers "14" and "88" (Dkt. 33 at 4-6); in a Facebook message on July 12, 2020, the defendant stated, "I love it bro that's y I fight this fight I live by the 14 words . . . We must secure the existence of our people and the future for white children" (*Id.* at 7); and in a Facebook message on October 9, 2020, the defendant stated, "I was A Nazi skinhead and still am at heart . . . weve been talking about RAHOWA for 30 plus years" (*Id.* at 8). This is not an exhaustive list. Rather, the government offers these examples to show only that this particular objection lacks merit.

Similarly, the defendant challenges the agents' opinions relating to certain Facebook messages and jail telephone calls wherein the defendant makes admissions about his possession of firearms and his prohibited status as a convicted felon. (*See*, *e.g.*, Fifth Revised PSR at ¶¶ 69, 79, 84, 86). As this Court is aware, the defendant pleaded guilty to possessing the 12-gauge shotgun and 30-06 rifle and, in the process, admitted that he knew he was prohibited from doing so by virtue of his prior felony conviction. (Dkt. 24 at ¶¶ 5(a)-5(e)). As a result, these objections lack merit as well.

The remaining disputed portions of the Fifth Revised PSR relate to information that provides background and context to the offense of conviction. (*See*, *e.g.*, Fifth Revised PSR at ¶¶ 26, 46, 54, 55, 66, 73, 77, 78, 82). For example, the defendant's presence as a counter-protester at a BLM protest in Rochester in July 2020 and a BLM protest in Caledonia in September 2020, and the racist statements by various individuals (including Donald Oshier, who gave the 12-gauge shotgun to the defendant) in online communications with the defendant, provide context and background for many of the defendant's Facebook posts and messages in which he described his anger and rage against Black people and BLM/ANTIFA protesters, and made statements about killing them.

## V.    CONCLUSION

Based on the foregoing, the government respectfully recommends that the Court impose a sentence of 120 months' imprisonment.

DATED:   Rochester, New York, August 29, 2024.

Respectfully submitted,

TRINI E. ROSS
United States Attorney

BY:   _____
BRETT A. HARVEY
Assistant United States Attorney
United States Attorney's Office
Western District of New York
100 State Street, Suite 500
Rochester, New York 14614
585/399-3949
brett.harvey@usdoj.gov